IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LARRY J. WOOLF,            )
                           )
            Plaintiff,     )
                           )
    v.                     )   Case No. 10-2444-JWL
                           )   (Consolidated for pretrial
CLARK D. STEWART and       )    in Case No. 09-2466-JWL)
DOUGLAS McW. SMITH,        )
                           )
            Defendants.    )
                           )
_____)

## **MEMORANDUM AND ORDER**

This matter is presently before the Court on defendants' motion to dismiss (Doc. # 85). For the reasons set forth below, the motion is **granted in part and denied in part**. Plaintiff's complaint is dismissed, although plaintiff may file an amended complaint, on or before **February 21, 2011**, to cure the deficiency regarding standing, as set forth herein.

### **I.    Procedural History**

The three cases in this consolidated litigation involve, on one side, Butler National Service Corporation ("Butler"), Clark Stewart (President and CEO of Butler's parent company), and Douglas Smith (Butler's project manager for this project); and on the other side, Navegante Group, Inc. ("Navegante") and Larry Woolf (Navegante's

founder, CEO, and principal shareholder). The litigation concerns the involvement of Navegante and Mr. Woolf in Butler's application to and eventual licensing by the State of Kansas to operate the Boot Hill Casino & Resort in Dodge City, Kansas.

On September 4, 2009, Butler and its affiliate, BHCMC, LLC (collectively, "Butler"), filed suit in this Court against Navegante and Mr. Woolf (Case No. 09-2466), in which Butler alleges as follows: In July 2008 Butler entered into a consulting agreement with Navegante concerning the casino project. The parties discussed a management contract, but no such agreement was ever reached or executed. Navegante and Mr. Woolf never made any capital contributions, and neither party was ever granted any equity position in Butler or the casino project. By a letter dated June 9, 2009, Navegante and Mr. Woolf asserted that their rights extended beyond the consulting agreement and included a percentage of the project as part of the management team. Based on these allegations, Butler seeks a declaratory judgment to the effect that the rights of Navegante and Mr. Woolf in the project are limited to the consulting agreement. Butler also alleges in a separate count that Navegante breached that agreement by failing to perform certain services.

On October 28, 2009, prior to service of Butler's lawsuit, Navegante brought suit in this Court against Butler (Case No. 09-2554). Navegante alleges in that suit that Butler promised and agreed that it would enter into a management agreement with Navegante (or a new entity created by Navegante) and that Navegante would receive an equity interest in the casino project. Navegante has asserted a claim for negligent

misrepresentation, based on the allegation that Butler falsely indicated that it would enter into a management agreement and share equity with Navegante. Navegante has also asserted a claim for unjust enrichment, based on the allegation that Navegante provided consulting and other services to Butler at substantially reduced rates.

On May 6, 2010, Navegante moved for leave to amend to add a fraud claim, based on alleged affirmative misrepresentations that Navegante would have a management and equity role in the project. By Memorandum and Order dated October 22, 2010, the Magistrate Judge rejected the proposed amendment as futile, based on his conclusion that the fraud claim did not comply with the particularity requirement of Fed. R. Civ. P. 9(b). On October 29, 2010, Navegante again moved for leave to amend, this time to assert a claim of fraud by silence based on Butler's alleged failure to tell Navegante that it would not honor its promise to allow Navegante or Mr. Woolf to participate in the management and revenue stream of the casino project. That motion remains pending. On February 10, 2010, Navegante's suit was consolidated with Butler's suit for pretrial purposes.

On August 10, 2010 (during the pendency of Navegante's first motion to amend), Mr. Woolf filed suit in this Court against Messrs. Stewart and Smith (Case No. 10-2444). Mr. Woolf's complaint includes the following allegations:

> 18. Following this meeting [on September 5, 2007], based on information his team had gathered, Woolf informed Stewart and Smith that he would be willing to bring to bear his own knowledge and experience as well as the resources of Navegante in order to move the project forward. He would be willing to commit capital to the project. In

3

exchange for these efforts, Navegante was to be paid for its consulting work on a fee-for-services basis and, in addition, Woolf was to receive a portion of Boot Hill's ongoing revenue stream in the form of management fees, among other things (such as distributions to equity), in the event the project was approved by the State. In the case of management fees, these were to be paid through Navegante or through a newly-formed entity to be owned by Woolf. Stewart and Smith agreed to these terms.

19. On or about October 11, 2007, Woolf and his team toured Dodge City with Stewart and Smith. Woolf was introduced to several city officials and dignitaries. Stewart portrayed Woolf as a partner in the Boot Hill project and loudly touted Woolf's experience and expertise. Towards the end of the visit, as Woolf and Stewart sat together in Stewart's car, Woolf asked Stewart to confirm that Woolf was in fact a partner in the project under the terms that had previously been discussed. Stewart confirmed that they were partners and would be working together on Boot Hill.

20. This was, of necessity, a handshake deal. With the parties scrambling to pull together information and materials to buttress the application, there was no time to negotiate and memorialize all the details of the parties' arrangement. More importantly, the project was still taking shape. It was uncertain which persons or entities would participate in ownership or how the project would be financed. Although Woolf, through Navegante, was to have a role in management and to receive a portion of the management fees, it was uncertain whether or how Woolf would share responsibilities with Stewart's company. . . .

21. Stewart and Smith requested and received flexibility from Woolf as the parties attempted to sort through these issues. According to Stewart and Smith, if they entered into a formal management agreement with Woolf or Navegante before funding was in place, it could narrow their potential sources of funding. Entities that might otherwise contribute capital to the project might object to the nature or terms of Woolf's or Navegante's involvement. Since additional capital was a prerequisite to Boot Hill becoming a reality, Woolf understood and agreed that his handshake deal could be modified at the behest of third-party investors, particularly gaming companies such as the Warner group, that had an obvious interest and expertise in managing gaming facilities. Woolf trusted and relied on Stewart and Smith to honor their promises without a formal management agreement in place. And Stewart and Smith assured

Woolf that they wanted him to be a part of the project and that his promised compensation would be preserved.

. . .

25. Stewart balked at executing a comprehensive management agreement purportedly because funding was still an open issue. Nonetheless, to placate Woolf and the Review Board and to ensure that Woolf would actively promote Boot Hill at the July 31st hearing, Stewart agreed as an interim solution to sign a consulting agreement with Navegante. This purportedly was intended as a showing of good faith for Woolf and to give the Review Board something concrete to consider as they evaluated the management competency reflected in the competing proposals for the Southwest Gaming Zone.

26. The consulting contract set forth a schedule of fees for various services to be provided by Navegante. Earned fees were to be converted into equity in the event Woolf ended up with an equity position in Boot Hill. In the alternative, if financing considerations prevented Woolf from having an equity position in Boot Hill, these fees were to be paid out to Navegante. In either case, in addition to these fees, Woolf was to participate in Boot Hill's ongoing revenue stream. This was a material part of the parties' handshake deal, and Woolf would not have remained involved in this project without this promise.

27. Having received assurances from Stewart and Smith that the parties' handshake deal would be honored, Woolf made a substantial capital commitment to the project and played a lead role at the July 31st hearing. . . .

. . .

29. Beginning in 2007 and continuing throughout 2008 and into 2009, Stewart and Smith repeatedly reaffirmed the parties' handshake deal. Among other things, Stewart sent Woolf a Memorandum of Understanding on November 7, 2007 acknowledging the normal management fees that Navegante received for participating in a project such as Boot Hill; and Smith sent Stewart a proposed management services agreement on December 30, 2008, purporting to document the management fees that Navegante would receive.

5

30. Woolf was further assured of his role and compensation as documented in two formal Operating Agreements drafted by Stewart's counsel. These were forwarded to Woolf for his review in early August, 2008 shortly after the Review Board public hearing.

31. Unbeknownst to Woolf, however, Stewart and Smith did not intend to live up to their end of the bargain. They did not believe they needed Woolf long term, and felt he was too expensive to keep around. Their plan was to string Woolf along so that he would continue providing them with the help they needed to make Boot Hill a reality without signing anything that gave Woolf the compensation he was promised.

. . .

34. Stewart and Smith, on the one hand, and Woolf, on the other hand, were to act as partners or joint venturers in Boot Hill. Instead, unbeknownst to Woolf, Stewart and Smith decided to seize the opportunity for themselves without paying Woolf the agreed-upon compensation.

In Count I of his complaint, Woolf asserts a claim for breach of fiduciary duty, based on the allegation that he and Stewart and Smith were joint venturers or partners. In the prayer for that count, however, *Navegante* prays for judgment and an order requiring *Butler* to pay the value of the benefit received from *Navegante*. In Count II, Mr. Woolf asserts a claim of fraud by silence, alleging that "among other things, Stewart and Smith had knowledge that they were not going to allow Woolf to participate in the ongoing revenue stream of Boot Hill." On November 2, 2010, Mr. Woolf's suit was consolidated for pretrial purposes with the other two lawsuits.

## II. **Compulsory Counterclaims**

In their motion to dismiss, Messrs. Stewart and Smith ("movants") argue that Mr.

Woolf's claims are precluded because they should have been asserted as compulsory counterclaims in Butler's suit, to which Mr. Woolf is a defendant. Rule 13(a) requires a defendant to state as a counterclaim any claim against an opposing party that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and that "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a). If such a compulsory counterclaim under Rule 13(a) is not brought, the claim is later barred. *See Avemco Ins. Co. v. Cessna Aircraft Co.*, 11 F.3d 998, 1000 (10th Cir. 1993).

The Court agrees with movants that Mr. Woolf's claims arise out of the same transactions and occurrences that give rise to Butler's claims. *See Pipeliners Local Union No. 798, Tulsa, Okla. v. Ellerd*, 503 F.2d 1193, 1198 (10th Cir. 1974) ("transaction" and "occurrence" are given flexible and realistic constructions to effect judicial economy by avoiding a multiplicity of suits and having all related controversies between parties tried in one action). Nevertheless, for two separate reasons, the Court rejects movants' argument that Mr. Woolf's claims are barred as compulsory counterclaims required to have been asserted in Butler's suit.

First, Mr. Woolf's claims were not compulsory counterclaims because the defendants to those claims (Mssrs. Stewart and Smith) were not plaintiffs in Butler's suit against Navegante and Mr. Woolf. *See Ponderosa Dev. Corp. v. Bjordahl*, 787 F.2d 533, 536 (10th Cir. 1986) (claims against persons that were not opposing parties in the earlier action are not barred by the compulsory counterclaim doctrine). Movants argue that

7

because they were acting at all times as representatives of Butler, Mr. Woolf's claims are more properly asserted against that entity, but movants have not cited any authority that would allow them to recast Mr. Woolf's claim in that manner for purposes of applying the compulsory counterclaim rule. Moreover, Mr. Woolf is entitled to assert his claims for breach of fiduciary duty and fraud directly against the individuals who allegedly became his partners and committed the fraud. *See, e.g.*, *State ex rel. Stephan v. Commemorative Servs. Corp.*, 16 Kan. App. 2d 389, 400 (1991) (corporate officer is personally liable for wrongful actions of corporation that he approved or sanctioned, and he is liable for participating in acts of fraud and deceit, without the need to pierce the corporate veil or apply an alter ego theory) (citing, inter alia, *Speer v. Dighton Grain, Inc.*, 229 Kan. 272, syl. ¶ 6 (1981)).[1]

Second, the majority of courts have found the compulsory counterclaim rule to be based on principles of *res judicata*. *See Raytheon Aircraft Credit Corp. v. Pal Air Int'l, Inc.*, 923 F. Supp. 1408, 1418 (D. Kan. 1996) (Marten, J.) (citing 6 Charles A. Wright, et al., *Federal Practice and Procedure* § 1417, at 131 (Civil 2d 1990)). Therefore, because Butler's suit has not yet proceeded to judgment, Mr. Woolf's claims are not barred by the rule. *See id.* Movants have not explained why the Court should not follow this majority rule; in fact, movants did not address this issue at all in their reply brief after it was raised by Mr. Woolf in response to the motions to dismiss.

---

[1]The parties agree that Mr. Woolf's claims are governed by Kansas substantive law.

8

Accordingly, the Court denies the portion of movants' motion seeking dismissal based on the compulsory counterclaim rule.

### III.  Application of Rule 9(b) to the Fraud by Silence Claim

Movants also seek dismissal of Mr. Woolf's claim of fraud by silence under Fed. R. Civ. P. 9(b) for failure to plead the fraud with particularity. Rule 9(b) requires a complaint alleging fraud to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (internal quotation omitted). This Court has noted that the rule is applied more liberally to claims of fraud by silence because of the difficulty in identifying exactly when, where, and by whom a representation should have been made. *See Near v. Crivello*, 673 F. Supp. 2d 1265, 1280 (D. Kan. 2009) (Lungstrum, J.).

The Court concludes that Mr. Woolf's complaint and its assertion of a claim for fraud by silence satisfies Rule 9(b)'s particularity requirement. The complaint does not merely recite the elements of the tort, as movants suggest, but contains specific facts regarding the circumstances and manner in which the fraud was allegedly committed, including the two individuals who made representations to Mr. Woolf, the dates and locations of specific meetings and representations, and the information that was allegedly withheld.

In this same section of their brief, movants have also argued, seemingly under

9

Fed. R. Civ. P. 12(b)(6), that Mr. Woolf's claim fails as a matter of law. Specifically, movants argue that Mr. Woolf cannot have reasonably relied on their statements in light of the consulting agreement actually executed here. *See Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman*, 267 Kan. 245, 260 (1999) (elements of fraud by silence include reasonable reliance and exercise of reasonable diligence). Movants have not pointed to any particular language in the consulting agreement, however, that would render unreasonable, as a matter of law, any reliance by Mr. Woolf on promises of an additional future contract.

Accordingly, the Court denies this portion of the motion to dismiss relating specifically to the claim of fraud by silence.

### IV. **Standing**

Finally, movants seek dismissal of Mr. Woolf's claims on the basis that he has not established his standing to assert them. The plaintiff bears the burden of establishing standing, and he must do so "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To survive a motion to dismiss, a plaintiff's complaint must include factual allegations that state a plausible claim for relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Movants argue that Mr. Woolf has not established standing at this stage because he has not alleged facts to show that he suffered harm separate from harm suffered by

10

Navegante, a separate entity. "In general, the law is that conduct which harms a corporation confers standing on the corporation, not its shareholders." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (footnote omitted). "An exception to this rule allows a shareholder with a direct personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." *Id.* at 757 (internal quotation omitted). Thus, although Navegante was undoubtedly involved here, Mr. Woolf certainly could allege that he personally, separate and apart from Navegante, was supposed to participate in the casino project and thus suffered harm from the allegedly wrongful conduct by movants—and Mr. Woolf argues that he has in fact so alleged in his complaint.

An initial problem with Mr. Woolf's position is that his claim that he suffered damages separate from those suffered by Navegante seems entirely inconsistent with the allegations made in the complaint filed by Navegante, which Mr. Woolf controls (and which is represented by the same counsel), and thus lacks plausibility. As noted above, Navegante's negligent misrepresentation claim (like his proposed fraud by silence claim) is based on allegations that Butler promised Navegante a management and equity role. The problem with viewing his allegations in this light, however, is that it depends on a consideration of Navegante's allegations in a separate action (albeit one consolidated for pretrial purposes). Movants have not pointed the Court to any authority that would allow it, in resolving a motion to dismiss, to consider such matters outside the pleadings in the particular case at issue, and the Court declines to convert movants' motion to one for summary judgment at this time. *See, e.g.*, *Utah Gospel Mission v. Salt Lake City Corp.*,

11

425 F.3d 1249, 1253 (10th Cir. 2005) (matters outside the complaint may not be considered unless the motion to dismiss is converted to one for summary judgment).[2]

Thus, the Court confines its analysis to Mr. Woolf's complaint. Even with that limitation, however, the Court still concludes that Mr. Woolf has not stated a plausible claim that, more likely than not, he suffered harm separate from the harm suffered by Navegante, his company. First, as movants note, with respect to his claim for breach of fiduciary duty, Mr. Woolf prays for relief from Butler (instead of from defendant movants) to Navegante (instead of to himself). Mr. Woolf describes the references to Butler and Navegante in that prayer as a clerical error that resulted from the use of the Navegante complaint as a "rough template" for Mr. Woolf's complaint. Whatever the reason for that language, however, that count on its face indicates that Navegante is the party that suffered harm from the alleged breach of fiduciary duty, which fact robs Mr. Woolf of standing to assert that claim.

Moreover, the factual allegations contained in Mr. Woolf's complaint, considered as a whole, support a claim that *Navegante* was promised and denied the management contract and equity position, and thus do not state a plausible claim that Mr. Woolf was

---

[2]Standing implicates the Court's subject matter jurisdiction, *see Day v. Bond*, 500 F.3d 1127, 1132 (10th Cir. 2007), and in some instances, a court may considers matters outside the complaint in resolving a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), *see Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). Where, as here, however, the jurisdictional question is intertwined with the merits of the case, the motion should be resolved either under Rule 12(b)(6) or under Rule 56. *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 717 (10th Cir. 2006).

the party aggrieved. For instance, in paragraph 18 of the complaint, Mr. Woolf alleges that although he was to receive a portion of the revenue stream in the form of management fees and other things (such as distributions to equity), "[i]n the case of management fees, these were to be paid through Navegante or through a newly-formed entity to be owned by Woolf." In paragraph 20, Mr. Woolf alleges as follows: "Although Woolf, *through Navegante*, was to have a role in management and to receive a portion of the management fees, it was uncertain whether or how Woolf would share responsibilities with Stewart's company." (Emphasis added.) In paragraph 26, he alleges as follows:

> Earned fees were to be converted into equity in the event Woolf ended up with an equity position in Boot Hill. In the alternative, if financing considerations prevented Woolf from having an equity position in Boot Hill, these fees were to be paid out to Navegante. In either case, in addition to these fees, Woolf was to participate in Boot Hill's ongoing revenue stream.

In paragraph 27, Mr. Woolf alleges that Mr. Stewart told the Review Board that Navegante would be sharing management fees as manager. In paragraph 28, he alleges that he caused Navegante personnel to work on the project. In paragraph 29, he alleges that, as acts reaffirming the parties' deal, movants drafted a proposed Memorandum of Understanding and a proposed management agreement noting the management fees that Navegante would receive. In paragraph 32, he alleges that Mr. Stewart eventually stated to him that "contrary to the representations he had made to Woolf and to the Review Board—Navegante would not have a long-term contractual role with Boot Hill."

13

It is true that the complaint also contains language indicating that Mr. Woolf was promised compensation. Overall, however, the complaint suggests that any such compensation—and particularly, management fees—would inure to Mr. Woolf's eventual benefit by being paid to Navegante, his company. Indeed, Mr. Woolf seems to concede as much in his opposition brief, as follows:

> While some (but not all) of Woolf's actions were undertaken as President and CEO of Navegante, *Navegante was, in large part, a mere instrumentality* through which Woolf could accomplish the purposes for which he was retained by Defendants. Navegante housed personnel who could assist Stewart and Smith with logistical issues attendant to developing a new gaming facility. Woolf directed such personnel to provided [sic] such assistance. However, separate and apart from Navegante, Woolf also assisted Stewart and Smith with financing and regulatory issues, and allowed Defendant's to leverage his (Woolf's) knowledge and relationships to increase the likelihood that Butler would be the successful applicant for the Southwest Gaming Zone. For these efforts, Woolf was promised a share of Boot Hill's ongoing revenue stream, *which may or may not have been paid through Navegante*.

Memorandum of Law in Opposition to Motion to Dismiss (Doc. # 91) at 10-11 (emphases added). Mr. Woolf may view Navegante as a "mere instrumentality," but if that instrumentality as an identifiable legal entity was expected to receive the benefit of the participation in the project, then it has the legal claim, and Mr. Woolf would not have standing.

In sum, Mr. Woolf has not made clear that he, not Navegante, was the party aggrieved with respect to any particular damages.[3] Accordingly, Mr. Woolf has not

---

[3]The Court notes that whether particular benefits were to be received by
(continued...)

14

stated a plausible claim that, more likely than not, he suffered damages separate and apart from any harm suffered by Navegante, and his complaint is subject to dismissal for lack of standing. The motion to dismiss is therefore granted to that extent.

Nevertheless, and especially as to alleged clerical errors, it is not clear that Mr. Woolf could not possibly state a plausible claim for which he has standing. Accordingly, the Court grants Mr. Woolf leave to file an amended complaint, on or before **February 21, 2011**, by which he may attempt to state such a claim. In any such complaint, Mr. Woolf should make clear how (and with respect to which damages) he suffered harm separate from any harm suffered by Navegante. Such a distinction is particularly important going forward in light of the seemingly inconsistent allegations made by Navegante in its case (of which the Court takes judicial notice).

In the event that Mr. Woolf does file an amended complaint, the Magistrate Judge shall conduct a status conference after the resolution of Navegante's pending motion to amend. At that conference, the Magistrate Judge and the parties should address any issues arising from the seemingly inconsistent allegations in the suits filed by Navegante and Mr. Woolf, including issues relating to further consolidation, the assertion of claims in the alternative, and any possible conflict of interest for counsel representing both

---

[3](...continued)
Navegante or by Mr. Woolf personally should be information within Mr. Woolf's knowledge, and thus is capable of being pleaded with some specificity. The Court further notes that Mr. Woolf has not attempted to join Navegante's suit as a party so that he and Navegante could jointly seek alternative forms of relief.

Navegante and Mr. Woolf.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motion to dismiss (Doc. # 85) is **granted in part and denied in part**, as set forth herein. Plaintiff Larry Woolf's complaint is dismissed, although Mr. Woolf may file an amended complaint, on or before **February 21, 2011**, that adequately states claims that Mr. Woolf has standing to assert.

IT IS FURTHER ORDERED BY THE COURT THAT, in the event that Mr. Woolf files an amended complaint, and after the disposition of the pending motion to amend in Case No. 09-2554 in this consolidated matter, the Magistrate Judge shall conduct a status conference to address issues arising from the claims asserted in both cases, as set forth herein.

IT IS SO ORDERED.

Dated this 7th day of February, 2011, in Kansas City, Kansas.

                                            s/ John W. Lungstrum
                                            John W. Lungstrum
                                            United States District Judge